## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**WARREN CHARLES BODEKER**,

Debtor.

Case No.  **12-60137-7**

# MEMORANDUM OF DECISION

At Butte in said District this 7th day of June, 2013.

Pending in this Chapter 7 case is the Trustee's Notice of Intent to Sell gold and silver of the estate at private sale to David A. Hakes of Missoula Gold & Silver Exchange (Docket No. 129), filed on October 12, 2012.  Debtor Warren Charles Bodeker ("Debtor" or "Renn") filed objections and appeared and testified at a hearing held at Missoula, Montana, on the Trustee's Notice on March 7, 2013.  Debtor objects that the Trustee's search of his home for his gold and silver was an illegal search and seizure under the Fourth Amendment[1] to the United States Constitution, and therefore that requiring Debtor to amend his Schedules to include the gold and silver should be suppressed and the gold and silver should be returned to the Debtor.  After the parties' concluded their cases-in-chief, the Court granted the parties through extension requests until April 24, 2013 to file briefs, which the Court has reviewed together with the record and applicable law.  For the reasons set forth below Debtor's objections are overruled and the Trustee

---

[1]The 4th Amendment provides:  "Unreasonable searches and seizures.  The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

1

will be authorized to sell the estate's gold and silver as provided in the Trustee's Notice.

This Court has jurisdiction of this Chapter 7 bankruptcy case under 28 U.S.C. § 1334(a). Approval of the sale of Debtor's gold and silver is a core proceeding under 28 U.S.C. § 157(b)(2)(N). This Memorandum of Decision includes the Court's findings of fact and conclusions of law.

Debtor Renn Bodeker appeared and testified at the March 7, 2013, hearing represented by attorney Kevin E. Vainio ("Vainio") of Butte. The Trustee Christy L. Brandon ("Trustee" or "Brandon") appeared and testified, represented by attorneys Robert K. Baldwin and Kyle Nelson of Goetz, Baldwin & Geddes, P.C., of Bozeman. Also testifying was the prospective purchaser of gold and silver, David A. Hakes ("Hakes"), and Renn's neighbor, Roxanne Ryan ("Ryan"). Exhibits ("Ex.") 1, 2, 3, 4, 7, and 8 were admitted into evidence.

### FACTS & PROCEDURAL HISTORY

Renn Bodeker is 90 years old and lives in Sanders County, Montana. He is a World War II combat veteran. Renn has some difficulty hearing, but he testified that he was able to hear the testimony at the hearing. Brandon testified that Renn sometimes asked her to repeat questions, but that he can understand questions if they are repeated. Ryan has been Renn's friend and neighbor for 13 years. She testified that she has attended meetings with Renn, after which he would ask her what happened and she must repeat things for him to understand.

Renn was married for several decades, but his wife died on July 3, 2011, after suffering from cancer. He and Ryan both testified that being alone after losing his wife of so many years caused Renn stress from being alone.

Renn testified that he has been a practicing Mormon for 52 years, and that he follows the

Mormon policy of having enough money and a 2-year food supply to be self sufficient, and have cash on hand in an emergency and for retirement.  As part of his philosophy of self sufficiency Renn owned his home free and clear and had all his possessions paid for.  Ryan testified that Renn values his privacy, and he has his property posted with a "No Trespassing" sign on the fence, and another sign on his door.

Ryan explained that Renn's goal of self reliance was behind his food storage, the lack of stairs in his residence, and his acquisition of gold and silver for his retirement.  Renn testified that a banker told him to hold onto every silver dollar that he could get for his retirement.  Hakes testified that some people hold gold and silver for their retirement, and that he advocates holding gold and silver.  In 2003, Renn purchased gold coins worth between $40,000 to $50,000.  He testified that he did not like them, so he traded them for other "intrinsic" coins, including gold and silver coins.  Ex. B.

Renn filed a voluntary Chapter 7 petition on February 2, 2012, with his Schedules and Statement of Financial Affairs ("SOFA").  At the time he filed his Chapter 7 petition Renn was represented by attorney Daniel S. Morgan ("Morgan").  The SOFA lists three lawsuits against Renn which had been reduced to judgment or partial judgment.

Brandon was added to the case as Trustee.  She testified that she is not an employee of the United States government.

On Schedule A Debtor listed his residence at "11 Freedom Ln" in Plains, Montana at a current value of $150,000 securing a single claim in the amount of $3,490.25, which Schedule D identifies consists of two secured creditors:   C. Robert Bates of 15 Freedom Ln in Plains secured by a judgment lien, and Cotter Law Office PC secured by a judgment lien.  Schedule C lists the

3

residence as a homestead exemption.

Schedule B failed to list Renn's gold and silver, and failed to list his food supply. Asked why he did not schedule his gold, silver and food, Renn answered that it was pursuant to his church's policy to be self sufficient for what may come, and he did not consider his food, gold or silver to be an asset. Asked about his failure to list his firearms, money and dall sheep mount, he answered that he was under heavy stress from the loss of his wife and he did not even think of those items, or his tractor and implements. He marked "none" at Schedule B, item nos. 10 ("Annuities") and 12 ("Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Give particulars"). Item 5 of Schedule B ("Books, Pictures and other art objects, antiques, stamp, coin, . . . and other collections or collectibles") lists $100 worth of coin/stamps.

Schedule C does not claim an exemption for Renn's gold and silver. However, Renn testified that he considered his undisclosed gold and silver to be "for my retirement, future, whatever might happen." Schedule F lists creditors holding unsecured nonpriority claims in the total amount of $106,290.08. Schedule I shows Renn's income as solely social security in the amount of $981 per month. Renn signed a declaration under penalty of perjury that he reviewed his Schedules, and that they are true and correct to the best of his knowledge, information and belief even though he failed to list the bulk of his gold and silver assets.

Renn filed an application to proceed in forma pauperis. The application requires that the Debtor disclose his assets. Renn signed the IFP application under penalty of perjury and failed to list his gold and silver. The Court granted his IFP application on February 3, 2012.[2]

Brandon reviewed Renn's Schedules, and she testified that she concluded based on her

_____

[2]After the discovery of Debtor's gold and silver assets, the Court vacated the IFP waiver.

4

review that the Debtor held "sovereign citizen" beliefs.[3]  The 11 U.S.C. § 341(a) meeting of creditors was scheduled for March 5, 2012, and after examining the Debtor the Trustee continued the meeting to April 9, 2012.  The Trustee testified that a person named Bob Bates ("Bates"[4]) called her a few days before the first 341 meeting, and sent her a letter, informing her that Renn had firearms, gold, silver and other undisclosed assets on his property, and Bates disputed the scheduled value of Debtor's residence.   After she spoke with Bates, Brandon contacted attorney Neal Jensen ("Jensen") of the Office of United States Trustee ("UST") informing him about the discrepancies in the Debtor's Schedules.

Brandon testified that she has a duty to report violations in disclosure requirements and suspicious activity to the UST.  She explained that the suspicious activity she reported was undervalued assets and Debtor's failure to disclose assets, which were alleged in the letter she received from Bates.  She testified that she did not discuss a criminal investigation with Jensen or any other federal government employee, and that the UST did not acquiesce or authorize her to conduct a criminal investigation of the Debtor.

Brandon testified that, when she reported the undisclosed assets to Jensen, she told Jensen that she intended to follow Renn home after the § 341 meeting to find the alleged missing assets. She testified that she called the Sanders County Sheriff's Department, identified herself as a bankruptcy trustee, and requested a uniformed deputy accompany to her to the Debtor's residence

---

[3]In general terms the "sovereign citizen" movement denies that its member are subject to the authority of federal and state governments, courts and/or statutes.  They are vehemently anti-tax.  Courts typically dispose of their contentions as frivolous.  *See, e.g., In re Becraft*, 885 F.2d 547, 548-51 (9th Cir. 1989).

[4]Bates is listed as a creditor on Schedules D, F and the SOFA with a judgment.  Brandon identified Bates as Renn's son.

because she did not want to go by herself.  The sheriff agreed to provide a "civil standby" for the Trustee.

The first § 341 meeting took place on March 5, 2012.  Brandon took the Bates letter to the 341 meeting.  Renn attended, represented by attorney Morgan, and Brandon described Renn as cordial and polite.

Brandon testified that Renn admitted at the § 341 meeting that he had cash and guns at his residence, but he "flatly denied" having any gold and silver.  Brandon asked Renn about the gold and silver, and she testified that he answered that he sold 1,000 oz. of silver but was otherwise vague, except that he said the gold and silver was "all gone."  As a result, Brandon testified, she felt she had a duty to go to the residence to corroborate Renn's statements[5] and secure the estate assets, including any gold and silver.  Ex. 3 (Transcript § 341 meeting, p. 36).  Asked why the allegations were significant, Brandon answered that Bates had alleged the value of the undisclosed assets exceeded $100,000.   Brandon answered "No" when asked if she went to Renn's residence to investigate a criminal case, and answered "No" when asked if she had been asked to investigate a criminal case.

Brandon testified that Renn asked if he had to let a sheriff into his home, and she replied that he did.  Ex. 3, p. 41.  Renn asked again, and his attorney answered "Yeah, yeah."[6]  Ex. 3, p. 41.  Renn was not told that he had the right to refuse Brandon access to his residence.

Brandon told Renn that she would follow him back to his residence.  She invited Morgan

---

[5]Renn had explained how he no longer had certain firearms and a leopard skin pelt about which Bates had told the Trustee.  Ex. 3, pp. 33-36

[6]Renn stated: "I just don't like ... (pause.)" His attorney explained "It's just to keep the peace," to which Renn replied "Okay."  Ex. 3, p. 41.

to come along, but Morgan declined.  Renn testified that he did not agree to the Trustee's search of his residence, but admitted that he said "OK."[7]  At the hearing he testified that because of the stress he was under, he should not have been driving with the Trustee following him.  He admits that he did not object to Brandon's search on the basis of the Fourth Amendment.

Brandon followed Renn back to his residence, and she testified that she returned again the next day.  She did not obtain a search warrant, and she did not research the need for a warrant. Brandon testified that she has gone to debtors' residences before in other cases, although it happens rarely.  She testified that she has not gone to debtors' homes with a deputy sheriff to seize assets before, but that cases involving intentionally concealed assets are not unusual and the UST has never objected to her going to debtors' homes.

At Renn's residence, Brandon recovered and collected property of the estate, and gave Renn a receipt for the items she collected, including $2,000 in cash, five firearms and a dall sheep mounted head.  She testified that Renn was cooperative when she entered his residence, that Renn guided Brandon to the cash, mounted head and firearms, and showed her the food storage area.  Renn testified that the Trustee took his cash from a coffee mug, and his pistol and dall sheep mount were hanging from the wall.  Brandon asked the deputy to accept the firearms from Renn.

Renn testified that he told the Trustee and deputy that he owned his residence under a land patent which made his 20 acres "untouchable," and he informed the Trustee of his UCC redemption theories, but Brandon repeated that she had a right to enter the Debtor's residence.

---

[7]Renn said "OK" to indicate that he heard the Trustee, he explained, not that he consented to the Trustee following him home.  Ryan testified that when Renn says "OK" it means that he heard and understands what was said to him.

Ex. 3, p. 39.  Brandon testified that she did not hear Renn accuse her of trespassing.  She interpreted Renn's reference to a land patent as a sovereign citizen notion.  Ex. 4, p. 31.  Renn testified that under his patent his property is not owned by the state, county or federal governments, and that he did not believe the Trustee or sheriff had a right to be on his property.

Brandon testified that she asked Renn if the food storage area was where he kept his gold and silver, and that Renn answered, "I've lied under necessity" and he pleaded his Fifth Amendment constitutional right against self incrimination, but that Renn was 100 percent cooperative with respect to all other assets.  Under cross examination, Renn repeated that he did not disclose his gold and silver in his Schedules based on his religious beliefs, and also his personal belief that he needed it for his future.  Trustee's counsel attempted to impeach Renn with his statement that he was "covering his rear."  Renn then testified that he does not consider his gold and silver to be an asset of the estate.  Ryan testified that Renn's lying under necessity was because he felt cornered, and that Renn's prior attorney Morgan failed to explain to Renn the risks involved in bankruptcy, and that if Morgan had explained Renn would not have filed his petition for bankruptcy relief.

Brandon testified that she talked to Bates after she failed to find the Debtor's gold and silver on her first trip to the residence.  Bates told her about the Debtor's "hidden room" and drew her a map where the gold and silver were buried.  Brandon returned to the home and searched again.  She testified that she did an online search to find a metal detector operator, found one and hired him to accompany her to the Debtor's residence.  But they again failed to find the gold and silver.  Renn was present during the Trustee's second visit, and Brandon

8

testified that he again was cordial and cooperative.[8]

Renn testified that he had his gold and silver stored in his food storage area, until he took his wife to Utah for cancer treatment.  When they returned, he testified, some of his silver had been stolen, and so he moved the rest of his gold and silver to keep the rest from being stolen. He buried at a depth of approximately two and a half feet in his yard some gold and silver in a 5 gallon bucket, and buried other gold and silver in a 3 gallon bucket in his greenhouse.

Renn testified that he knew where his gold and silver were buried, and that he was "dumbfounded" that the "geiger counter" operator was not able to find his gold and silver because he must have gone right over the spot where it was buried.  After the Trustee left the property, Renn asked Dick Kline[9] ("Kline") to come help him dig up the gold and silver and move it to another location where it was re-buried.  Ex. 4, p. 57.  Renn explained that he became suspicious when the metal detector failed to find his buried gold and silver, and Kline told him there was "no way" the detector could have gone over the ground without finding the gold and silver.  Renn suspected that the metal detector operator was going to return and steal his gold and silver.  Therefore, Renn decided that the gold and silver had to be moved.  He testified that if the Trustee had not searched his home, the gold and silver would still be buried.

Renn called Kline to help with the digging, and Kline dug up the gold and silver and inventoried it without Renn's permission.  Renn testified that when he checked, about 360

---

[8]Asked by his attorney on direct examination whether he trusts Brandon, Renn answered "No.  I think she's out to see me dead."

[9]Renn met Kline after Kline read an op-ed letter authored by Renn in the local newspaper, and Kline sought to make Renn's acquaintance.

"rounds" or 60 pounds of silver, was missing and Kline never returned it.[10]

Brandon testified that Renn did not reveal the existence of his gold and silver, and she did not get any other information about his gold and silver, on March 5 or 6, 2012. Brandon testified that she did not find any gold or silver on Renn's property, and she did not return after March 6, 2012. She deposited the cash, sold the Dall sheep ram shoulder mount, and still has the firearms.

After the first 341 meeting, the Trustee filed a motion for turnover, including requesting turnover of all documents in Debtor's possession regarding his disposition of gold and silver inventory. She also emailed Debtor's attorney Morgan asking for all documents regarding Debtor's purchase and sale of gold and silver. She informed Jensen again that she had a case involving undisclosed assets. She explained that the UST has a "watchdog" role in the bankruptcy system, and that she has an affirmative duty under the Bankruptcy Code to report undisclosed assets cases.

On April 6, 2012, the Debtor, Trustee and U.S. Trustee filed a stipulation (Dkt. 29) to deny Debtor's discharge and waive his homestead exemption, based on Debtor's failure to disclose significant assets in his Schedules and during the § 341 meeting, and his failure to maintain records and failure to attend a Rule 2004 examination. Renn testified that he agreed to waive his discharge and homestead on advice of his counsel Morgan, because the UST had threatened him with criminal prosecution. The Court approved the stipulation by Order entered April 9, 2012, denied Renn's discharge and ordered his homestead exemption waived (Dkt. 31).[11]

---

[10]Renn testified that he filed a police report complaining about Kline's theft.

[11]Renn agreed that he waived his homestead, but he testified that he returned to the county courthouse a few days later and recorded another homestead declaration.

The 341 meeting continued on April 9, 2012.  At that meeting Renn produced documents and admitted for the first time that he owned gold and silver worth at least $22,000.  Ex. 4, pp. 41-48.  He testified that he felt threatened with criminal prosecution if he failed to disclose it, and that Morgan had him speak with an attorney who specialized in criminal law.  Jensen attended the second 341 meeting.  Brandon testified that Jensen asked the Debtor where the gold and silver was, Renn answered that it was in his home at the food storage area, and Jensen told him to turn it over.  Ex. 1, p. 55.  Renn testified that Kline told Jensen that he had the gold and silver.  Later, Renn testified that some of his coins had been buried in the ground near his fence in a 5 gallon bucket, and others were buried in his greenhouse.  Ex. 4, pp. 52-53.

Renn gave the Trustee a written statement explaining why he did not previously disclose his gold and silver.  Brandon testified that Renn's statement said that he "lied out of necessity" because "social security is going to be gone and some day the dollar's going to crash, like they're talking a lot about today."  Ex. 4, pp. 50-51.  Renn was saving his gold and silver for when he needed money in his old age.  He did not list the gold and silver in his schedules because "I thought I was protecting my rear . . . . Survival in our old age."  Ex. 4, p. 51.  Under cross examination Renn testified that normally he does not lie, but he did at that time out of necessity and to protect his food storage and future because he cannot work.

Debtor's attorney Vainio asked Ryan for her opinion of Renn's reputation for truth and veracity.  Notwithstanding Renn's admission that he lied out of necessity, Ryan, who said she has known Renn for 13 years, testified that she has never known Renn to not tell the truth.  On cross examination Ryan acknowledged that she heard Renn admit that he lied under oath out of necessity, and that his Schedules failed to disclose his gold and silver.

11

Kline appeared at the second 341 meeting and told the Trustee and Jensen that he had buried Renn's Debtor's gold and silver where it was then located, and Kline said that he would help Renn deliver the gold and silver to the Trustee because it was too heavy for Renn to do by himself.  Ex. 4, p. 56.  Renn testified that Kline told Morgan about Renn's gold and silver, but Morgan did not have any place to put it.

The UST scheduled a Rule 2004 examination of Renn for April 16, 2012.  Brandon testified that Kline carried the Debtor's gold and silver to Mountain West Bank, where she had rented a safe deposit box, and Brandon stored the gold and silver there.  The Trustee withdrew her no-asset report on April 17, 2012.

Morgan withdrew as Debtor's attorney with Renn's consent on May 11, 2012.  Vainio filed a notice of appearance on June 29, 2012.

The UST filed a motion to compel Debtor to amend and correct his Schedules on August 30, 2012.  Debtor filed an objection, contending that the Trustee's search of his residence violated his Fourth Amendment rights.[12]  Renn testified that he still thinks the gold and silver are his, and that it represents his retirement like a 401k or IRA account, only his was in the ground and still would be if the Trustee had not gone to his home.

On October 12, 2012, the Trustee filed her Notice of Intent to Sell the estate's gold and silver inventory to Hakes of Missoula God & Silver Exchange, with an attached inventory itemizing the gold and silver coins.  The Trustee's Notice states that Hakes offers to purchase the estate's gold and silver on that date for approximately $86,012, subject to increase or decrease

---

[12]That matter has been continued without date.

depending on the market prices on the date the sale is concluded.[13]  The Trustee's Notice further

provides for qualifying upset bids, and an auction sale to the highest bidder in the event she

receives an upset bid.

Debtor filed an objection to the sale on October 26, 2012, on the grounds that the Trustee

obtained the gold and silver by means of an illegal search without a warrant in violation of the

Fourth Amendment, and the proposed sale price is below the market value of the property.

Debtor contends that he objected to the Trustee's search but was ignored, and he argues that the

search should be suppressed and the gold and silver seized and held by the Trustee should be

returned to him.

### Hakes' Value Opinion

David Hakes testified and gave an opinion of the value of the estate's gold and silver

inventory.  Hakes has been in the gold and silver business since 1965, and has owned Missoula

Gold and Silver Exchange for 40 years.  He examined the estate's gold and silver inventory

twice, the first time in April 2012 and again on October 10, 2012.  He consulted with another

coin dealer identified in the Trustee's Notice as J.B. Love of Coins & Carats of Kalispell,

Montana.

Hakes testified that the value of gold depends on supply and demand, and the market is

unpredictable.  The silver market has been in decline until recently, and silver sales operate on a

very thin margin.  All of the estate's coins have been certified by two third-party grading level

services.  Hakes testified that the estate's coins reflect three divisions in grade, and the coins are

---

[13]The Court notes that there has been a decrease in the market price of gold since the
March hearing.

13

of a common type.

Ex. 7 is Hakes' list of the estate's portfolio and value as of April 19, 2012.  The Trustee

noted that she asked Hakes and Love in October 2012 for their offer and Hakes gave a higher

price.  Hakes listed the different types of gold and silver coins in Ex. 7.  Ex. 7 states the grand

total of the gold and silver in the amount of $66,913.00 as if April 19, 2012.

Ex. 8 is an e-mail exchange between the Trustee and Hakes.  The Trustee asked Hakes to

contact her if he was interested in purchasing the estate's gold and silver.  Hakes replied on

October 10, 2012, citing his April valuation which had increased as of October 10, 2012**.**  At the

hearing, Hakes testified that he would be willing to pay for the estate's gold and additional 500

oz. of silver, as of 9:15 a.m. that morning, the sum of $76,505, again subject to market

fluctuation.  On cross examination about his latest offer, Hakes testified that more demand exists

than in April 2012 because more buyers than sellers exist, but that also his latest offer reflects

another 500 oz. of silver which the Trustee discovered.

Hakes testified that, in the event of an auction sale, he would not participate, and that an

auctioneer such as Gardner's Auction Service in Missoula would charge a sale commission

ranging from 8 percent (8%) to 20%.  If the gold and silver was sold on eBay, approximately

10% to 14% would be deducted from the sale proceeds for costs.

## DISCUSSION

### A.  Contentions of the Parties.

Debtor argues that civil search warrants and bankruptcy court orders are not exempt from

the Fourth Amendment protection against unreasonable searches and seizures, citing *Spacone v.*

*Burke (In re Truck-A-Way)*, 300 B.R. 31, 36 (E.D. Cal. 2003).  He contends that the Trustee had

no right to possess his gold and silver, and that her possession of his gold and silver is the result of her search of his residence, without his consent, and in violation of the Fourth Amendment because she did not obtain a warrant and was assisting the government investigatory purposes. Renn requests that the illegal seizure of his gold and silver be suppressed, that the Trustee be prohibited from selling the gold and silver and she instead be ordered to restore the gold and silver to him.

The Trustee contends that the Fourth Amendment does not apply to her activities as a Chapter 7 Trustee to maximize the value of the estate, that Renn consented to her search and voluntarily surrendered the gold and silver, and that Renn has no legal right to possess the gold and silver, which should instead be sold with the proceeds going to the creditors.

### B.  Applicable Bankruptcy Statutes.

Before discussing the Fourth Amendment, the Court deems it appropriate to set forth the statutes applicable to Renn's gold and silver, and Renn's rights and duties as Debtor under the Bankruptcy Code.  Renn filed a voluntary Chapter 7 petition.  Bankruptcy relief comes with burdens as well as benefits.

As Debtor Renn has enumerated duties under 11 U.S.C. § 521(a), including the duty to file Schedules under oath, and a specific duty at § 521(a)(3) "to cooperate with the trustee as necessary to enable the trustee to perform the trustee's duties . . . ."  It is undisputed, as set forth above, that Renn filed Schedules under penalty of perjury which failed to disclose his gold and silver, and other assets.  He also filed an IFP application which failed to disclose the gold and silver.  Renn admitted under oath that he "lied" out of necessity in order to keep the gold and silver for his future needs.  This Court has long recognized an "obvious and fundamental maxim

15

in bankruptcy – that providing false information under oath in a bankruptcy proceeding is not a matter to be taken lightly." *Torgenrud v. Schmitz (In re Schmitz),* 17 Mont. B.R. 43, 46 (Bankr. D. Mont. 1998), citing *In re Tully,* 818 F.2d 106, 112 (1st Cir. 1987) ("Sworn statements in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming."). Given his repeated lies, and notwithstanding Ryan's vouching for his reputation for truthfulness, Renn destroyed his own credibility, and his professed necessity for lying is unavailing.

Renn resists amending his Schedules to add the gold and silver, and no claim of exemption is stated in his Schedule C for the gold and silver. Where a debtor fails to list an asset on his or her schedules, "that asset continues to belong to the bankruptcy estate." *Cusano v. Klein,* 264 F.3d 936, 945-46 (9th Cir. 2001); *Stein v. United Artists Corp.,* 691 F.2d 885, 893 (9th Cir. 1982) (only listed assets in the bankruptcy proceedings revert to debtor after discharge); *accord Hutchins v. IRS,* 67 F.3d 40, 43 (3d Cir.1995)*;Vreugdenhill v. Navistar Int'l Transp. Corp.,* 950 F.2d 524, 526 (8th Cir.1991) (holding that property is not abandoned by operation of law unless the debtor "formally schedule[s] the property before the close of the case").

Brandon was appointed as Trustee in this Chapter 7 case. The Trustee's duties are set forth at 11 U.S.C. § 704(a), including § 704(a)(1) to "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as possible as is compatible with the best interests of parties in interest." The bankruptcy trustee has the duty and authority to take actions that "maximize the value of the estate." *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 352, 105 S.Ct. 1986, 1993 (1985); *In re Moore,* 110 B.R. 924, 927 (Bankr. C.D. Cal. 1990); *Schnelling v. Thomas (In re AgriBioTech, Inc.),* 319 B.R. 207,

16

211 (D. Nev. 2004) (trustee is required to "marshall all of the estate's property for the estate's benefit"). Renn argues that the Trustee failed to obtain a search warrant and failed to file a motion for turnover of the gold and silver. However, since § 704(a)(1) specifically authorizes and requires the Trustee to collect property of the estate, Brandon was authorized but not required to file a motion for turnover under 11 U.S.C. § 542 before collecting the Debtor's assets, while Renn by contrast was required by § 521(a)(3) to cooperate with the Trustee.

When a debtor files a chapter 7 petition, all of his or her assets become property of the estate and may be used to pay creditors, subject to the debtor's ability to reclaim specified property as exempt. *Schwab v. Reilly*, _ U.S. _, 130 S. Ct. 2652, 2657 (2010). Section 541(a) of the Bankruptcy Code states that the commencement of a case creates an estate, and broadly defines "property of the estate" to include "all the following property, wherever located and by whomever held:"

> (1) . . . all legal or equitable interests of the debtor in property as of the commencement of the case.

> In discussing the broad definition of "property of the estate", this Court wrote:

> Section 541(a)(1) of the Bankruptcy Code is intended to include in the estate "all legal or equitable interests of the debtor in property as of the commencement of the case." *In re Campbell (Balyeat Law Offices v. Campbell)*, 14 Mont. B.R. 132, 140-41 (9th Cir. BAP 1995). In *Campbell* the BAP wrote:

>> The legislative history indicates that the scope of § 541(a)(1) is broad. *See United States v. Whiting Pools, Inc.*, 468 U.S. 198, 205 (1983). Section 541(a)(1) is intended to include in the estate any property made available to the estate by any other provisions of the Bankruptcy Code. *Id.* (*citing* H.R. Rep. No. 95-595, p. 367 (1977)). Several provisions in the Code permit the trustee to recover property in which the debtor did not have a possessory interest when the bankruptcy petition was filed. *See, e.g.,* 11 U.S.C. §§ 543, 544, 547 & 548; *Whiting Pools,* 462 U.S. at 205.

17

> Thus, "[a]n estate in bankruptcy consists of all the interests in property, legal and equitable, possessed by the debtor at the time of filing, as well as those interests recovered or recoverable through transfer and lien avoidance provisions." *Owen v. Owen*, 500 U.S. 305, 308 (1991).

*In re Weatherwax*, 16 Mont. B.R. 304, 308-09 (Bankr. D. Mont. 1997).

State law determines the extent of a party's interests in property and when such interests expire. *In re Contractors Equip. Supply Co.*, 861 F.2d 241, 244 (9th Cir. 1988); *see also Nobelman v. Am. Savings Bank*, 508 U.S. 324, 329 (1993) ("In the absence of a controlling federal rule, we generally assume that Congress has 'left the determination of property rights in the assets of a bankrupt's estate to state law,' since such '[p]roperty interests are created and defined by state law.' *Butner v. United States*, 440 U.S. 48, 54-55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). *See also Barnhill v. Johnson*, 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992)"). No contention is made that any other party owned an interest in Renn's gold and silver. Given the broad definition of property of the estate under § 541(a)(1), his gold and silver is property of the estate, as is his residence notwithstanding his claim to an "allodial land patent."[14]

Exemptions are provided under 11 U.S.C. § 522. Section 522(b)(3)(A) applies state or local exemption law "that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 730 days immediately preceding the date of the filing of the petition . . . ." Pursuant to 11 U.S.C. § 522(b)(2), Montana has opted out of the federal exemption scheme by means of MONT. CODE ANN. ("MCA") § 31-2-106. *In re Reilly,* 18

---

[14]The court in *Hamilton v. Noble Energy, Inc.*, 220 P.3d 1010, 1014 (Colo. App. 2009) surveyed cases rejecting claims that self-proclaimed land patents are "meritless" and "frivolous." (Citing cases).

18

Mont. B.R. 193, 194-95 (Bankr. D. Mont. 2000). Thus, the Court looks to state law rather than federal law to determine the allowance of any claimed exemption. *In re Reilly,* 18 Mont. B.R. at 194-95; *In re Loeb*, 12 Mont. B.R. 524, 527 (Bankr. D. Mont. 1993).

Renn has not claimed an exemption in the gold and silver in his Schedule C, yet he believes that it is his, just like an IRA or 401k account. Exemptions for retirement are provided for without limitation at MCA § 25-13-608(1)(e), for individual retirement accounts (IRA) or Roth IRAs. That section does not, however, provide for an exemption for buried gold and silver. Renn fell victim to scaremongering about the safety of the dollar, the economy, social security and other bulwarks of modern society, and he decided in the interest of self reliance to invest large amounts of his assets in gold and silver. Unfortunately, no provision exists under Montana law allowing an exemption of gold and silver buried for retirement. Therefore, under bankruptcy law his gold and silver is property of the estate which the Trustee is duty bound to administer, while under Montana law applicable through § 522(b)(3)(A) he would be unable to claim an exemption for his gold and silver even if he had not lied about it.

Nevertheless, Renn requests that the gold and silver be returned to him for his use based on the Fourth Amendment.

### C. Fourth Amendment of the United States Constitution.

The Fourth Amendment of the Bill of Rights provides:

Unreasonable searches and seizures. The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. Amend. IV.

The bankruptcy court *In re Kerlo*, 311, B.R. 256, 263-265 (Bankr. C.D. Cal. 2004)

provides an apt and extended discussion of Fourth Amendment applicability, including the case

law cited by both parties in the instant case:

> The Fourth Amendment generally does not protect against unreasonable
> intrusions by private parties. *See Burdeau v. McDowell*, 256 U.S. 465, 475, 41
> S.Ct. 574, 65 L.Ed. 1048 (1921). However, the Fourth Amendment applies to the
> conduct of private parties acting as instruments or agents of the government.
> *Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S.Ct. 2022, 29 L.Ed.2d 564
> (1971). The Ninth Circuit has explained:
>
>> [T]here exists a "gray area" between the extremes of overt
>> governmental participation in a search and the complete absence of
>> such participation. The resolution of cases falling within the "gray
>> area" can best be resolved on a case-by-case basis with the
>> consistent application of certain general principles.
>
> *United States v. Walther*, 652 F.2d 788, 791–92 (9th Cir.1981) (citations omitted).
> In a later case, the Ninth Circuit stated:
>
>> The general principles for determining whether a private individual
>> is acting as a governmental instrument or agent for Fourth
>> Amendment purposes have been synthesized into a two part test.
>> According to this test, we must inquire:
>>
>> (1) whether the government knew of and acquiesced in the
>> intrusive conduct; and (2) whether the private party intended to
>> assist law enforcement efforts or further his own ends.
>
> *United States v. Reed*, 15 F.3d 928, 931 (9th Cir.1994) (citing *United States v.
> Miller,* 688 F.2d 652, 657 (9th Cir.1982)).
>
> The same test applies to non-law enforcement government employees.
> *United States v. Attson*, 900 F.2d 1427, 1433 (9th Cir.1990). Discussing the
> second part of the test, the *Attson* court explained that " 'where the private party
> has had a *legitimate independent motivation* for' engaging in the challenged
> conduct, the fourth amendment would not apply." *Attson*, 900 F.2d at 1432
> (quoting Walther, 652 F.2d at 792).
>
> In *Attson*, Attson was convicted for manslaughter for driving his vehicle
> while drunk and causing the death of his passengers. When taken to a hospital, he

consented to emergency care. The attending doctor ordered a blood test to see if alcohol was masking symptoms of pain. The district court allowed the blood test results at trial after denying a suppression motion. The Ninth Circuit affirmed after analyzing *Walther*'s two part test: "(1) the government's knowledge and acquiescence [of the challenged conduct], and (2) the intent of the party performing the search." *Walther*, 652 F.2d at 792. Focusing on the second prong, the court concluded that the government doctor did not act with the intent to assist the police in its investigatory or administrative purposes. Rather, the doctor acted with an independent purpose, that being to test the blood for medical reasons. *Attson*, 900 F.2d at 1432.

The Ninth Circuit has refused to apply the Fourth Amendment in several different contexts based on the legitimate independent motivation of the private party that engaged in the challenged conduct. *See Miller*, 688 F.2d at 657 (search of the defendant's residence by a private party for the purpose of recovering stolen property); *United States v. Chukwubike*, 956 F.2d 209, 212–13 (9th Cir.1992) (intrusive medical procedures used by a physician in order to protect the defendant's health and safety); *United States v. Gomez*, 614 F.2d 643, 645 (9th Cir.1979) (search of misplaced luggage by an airline employee for the purpose of identifying the owner).

Furthermore, the involvement of government officials does not necessarily transform private conduct into a government search or seizure. *See Chukwubike*, 956 F.2d at 212–13 (defendant detained and transported to the hospital by customs officials prior to treatment by a physician); *Gomez*, 614 F.2d at 645 (misplaced luggage found and transported by a county detective prior to search by an airline employee). This is especially true where the purpose of the government presence is to ensure the safety of the private party and not to "reap the benefits" of the search or seizure. *Miller*, 688 F.2d at 658 (search of defendant's residence by a private party accompanied by a federal agent).

*Kerlo*, 311 B.R. at 263-64.

Applying the two part *Walther* test in the instant case, based on Brandon's testimony the government, in the form of the UST, knew of and acquiesced to Brandon's conduct of the search of the Debtor's home under the first prong.  However, as in *Miller, Chukwubike* and *Kerlo*, this Court finds that no evidence exists in the record that the private party, Brandon, intended to assist law enforcement efforts under the second prong.  Rather, she searched Renn's house to further

her own ends and for a legitimate independent motivation, i.e., to satisfy her trustee duties under

§ 704(a)(1) to collect property of the estate.  She testified that she went to Renn's residence to

find and secure undisclosed property of the estate, not for criminal investigative purposes.  No

credible evidence exists in the record that Brandon was assisting law enforcement efforts when

she followed Renn home to take possession of property of the estate.  Moreover, after Renn's

waiver of his discharge and homestead, little, if any, evidence exists in the record of law

enforcement activity in this case.  *See Kerlo*, 311 B.R. at 263-64.  Debtor's counsel argues that

Brandon was assisting law enforcement efforts, but he offered no credible evidence in support of

that argument,[15] and attorney argument is not admissible in evidence and not relevant.  *Hurley v.*

*Student Loan Acquisition Auth. of Ariz.*, *et al.*, (*In re Hurley*), 258 B.R. 15, 23 (Bankr. D. Mont.

2001) (An attorney's argument is not evidence); *United States v. Velarde-Gomez*, 224 F.3d 1062,

1073 (9th Cir. 2000); *Exeter Bancorporation v. Kemper Securities Group, Inc.*, 58 F.3d 1306,

1312 n.5 (8th Cir. 1995).

The involvement of the deputy sheriff on civil standby did not transform Brandon's

private conduct into a governmental search or seizure.  Brandon testified that she asked for civil

standby to ensure her own safety, and no evidence exists that the purpose of the deputy's

presence was to "reap the benefit" of the search for the county sheriff or federal government.

*Kerlo*, 311 B.R. at 264, quoting *Miller*, 688 F.2d at 658.  Unlike in *Truck-A-Way*, the deputy

sheriff on civil standby for Brandon was not a federal law enforcement officer.  300 B.R. at 36.

Turning to Debtor's arguments and citation to *Truck-A-Way* in support of his contention

---

[15]The fact that Morgan had Renn consult with a criminal law attorney is not evidence of
Brandon's intent to assist law enforcement efforts.

that Brandon's search violated the Fourth Amendment, the court in *Kerlo* explains:

In *Taunt v. Barman (In re Barman)*, 252 B.R. 403, 412–13 (Bankr.E.D.Mich.2000), the bankruptcy court stated:

[The] circumstances surrounding the status and function of a trustee in a chapter 7 case all suggest a sufficient nexus to the government and its power that it is necessary and appropriate to apply to the trustee the fourth amendment limits on government power.

The *Barman* court began its analysis by applying the standard for whether the actions of a private person are fairly attributable to the government in the context of a violation of the Fourteenth Amendment. In determining that a trustee acts under "color of law," the court discussed the statutory obligations, judicial control, and executive oversight of trustees under the Bankruptcy Code. *Id.* at 411–12. The court in *Spacone v. Burke ( In re Truck–A–Way)*, 300 B.R. 31, 38 (E.D.Cal.2003), cited *Barman* and implicitly adopted the holding without discussion.

Trustee correctly asserts that neither the *Barman* court nor the *Truck–A–Way* court applied the two part test articulated by the Ninth Circuit for determining whether a private party acted as an instrument or agent of the government. Instead, these courts determined that the Fourth Amendment applies because a trustee acts under color of law.

The Ninth Circuit has stated:

Unlike the "state actor" standard of the Fourteenth Amendment or the "color of law" standard of section 1983, the fourth amendment cannot be triggered simply because a person is acting on behalf of the government. The fourth amendment will only apply to government conduct that can reasonably be characterized as a "search" or a "seizure." Thus, for the conduct of a non-law enforcement governmental party ... to be subject to the Fourth Amendment, [plaintiff] must show that [defendant] acted "with the intent to assist the government in its investigatory or administrative purposes, and not for an independent purpose."

*Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 924 (9th Cir.2001) (citing *Attson*, 900 F.2d at 1429, 1433). Accordingly, the *Barman* and *Truck–A–Way* courts did not apply Ninth Circuit law when they determined that the Fourth Amendment governed a trustee's conduct.

*Kerlo*, 311 B.R. at 264-65.

In the instant case this Court is bound by *Arpin, Attson* and other Ninth Circuit precedent. For Brandon's search to be subject to the Fourth Amendment, Renn had to show that she acted with the intent to assist the government in its investigatory purposes and not for an independent purpose. *Kerlo*, 311 B.R. at 265, quoting *Arpin*, 261 F.3d at 924. The Court concludes that Renn failed to satisfy that showing. Brandon's testimony shows that she went to Renn's residence for the independent purpose of searching for and taking possession of property of the estate, which Renn had failed to disclose, and that is all she did and then she gave Renn a receipt and left.

By contrast, in *Truck-A-Way* the trustee's counsel applied for and obtained an *ex parte* order authorizing counsel and to enter, search and seize debtor's property, pick locks, search any person on the premises, and use reasonable force necessary to effectuate the order. 300 B.R. at 33-34. Counsel entered defendant Linda Burke's residence with two armed U.S. Marshals, confronted her in front of two young children, searched the house and bedrooms, exceeded the court's authorization by searching vehicles, seized items "that suggested intimacy," vehicle titles, and seized boxes of documents, including documents from defendant's attorney which were likely subject to the attorney-client privilege. 300 B.R. at 34-36, 38. The defendant filed a motion to disqualify the trustee's counsel. The district court, Hon. Frank C. Damrell, Jr., granted defendant's motion and disqualified trustee's counsel under its inherent power because counsel violated the express language of the order and confronted defendant in front of two young children. *Id.* at 38-40.

No such egregious conduct by Brandon has been shown in the instant case. Brandon

followed Renn home after the § 341 meeting to secure and retrieve property of the estate which Renn had failed to disclose.  Renn was not surprised and had notice of Brandon's intentions because she told him and his attorney at the § 341 meeting that she was going to follow Renn home.  Renn voluntarily showed Brandon and turned over cash, firearms and the dall sheep mount.

Now, Renn's new counsel argues that Renn did not consent to Brandon's following Renn home and searching for property of the estate.  However, the evidence shows that Morgan was present at the § 341 meeting and explained to Renn that the Trustee would follow him home and "poke around."  Renn did not refuse or object based on the Fourth Amendment, and neither did his attorney.  Renn said "Okay," which meant that he understood what the Trustee was going to do.

A person who has consulted with an attorney "can be charged with constructive knowledge of the law's requirements."  *Stallcop v. Kaiser Foundation Hospitals*, 820 F.2d 1044, 1050 (9th Cir.1987).  Renn voluntarily selected Morgan as his attorney.  Renn cannot now avoid the consequences of the acts or omissions of his freely-selected attorney if the attorney failed to object on the basis of the Fourth Amendment, and instead advised Renn to allow Brandon to follow him home and "poke around," simply by hiring a new attorney who raises the Fourth Amendment in opposition to a sale of what is unquestionably property of the estate.  *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership*, 507 U.S. 380, 396-97, 113 S.Ct. 1489, 1499, 123 L.Ed.2d 74 (1993); *In re Casey*, 193 B.R. 942, 949 (Bankr. S.D. Cal. 1996).

This Court notes that the district court in *Truck-A-Way* "strongly disagrees with *In re*

25

*Barman's* interpretation of a bankruptcy court's authority under the Fourth Amendment . . . ."
300 B.R. at 38.[16]  While the court disqualified trustee's counsel under its inherent power, 300
B.R. at 40, in another adversary proceeding related to the same bankruptcy but against defendant
James D. Burke, Judge Damrell denied defendant's motion to suppress evidence and motion to
dismiss which were based on the Fourth Amendment and the same search which was the subject
of his decision in *Truck-A-Way*, 300 B.R. 31.  *United States of America v. Burke*, 2009 WL
173829 *10 (E.D. Cal.).  If the author of *Truck-A-Way* denied a motion to suppress evidence
seized under the egregious facts in that case, in this Court's view *Truck-A-Way* is no support for
Renn's request to suppress Brandon's sale of the gold and silver and restore it to Renn.

The Trustee collected Debtor's gold and silver and seeks authorization to sell it pursuant
to her trustee duty under § 704(a)(1).  Section 363(b)(1) authorizes a trustee to sell property of
the estate.  11 U.S.C. § 363(b)(1).  As the court states in *Kerlo*:

> Trustees in bankruptcy are not law enforcement officials. As previously
> discussed, a trustee is required to assemble assets of the estate, liquidate those
> assets for the benefit of creditors, and distribute proceeds of the estate to creditors.
> Although trustees may seek the assistance of governmental officials in carrying
> out their statutory and fiduciary duties and orders of the court, they do not act to
> assist the government in its investigatory or administrative activities. Rather, the
> trustees act independently under their statutory mandate in the Bankruptcy Code.
> Accordingly, a trustee or agent to a trustee is only subject to the Fourth
> Amendment if (1) the government knew of and acquiesced in the conduct and (2)
> the trustee acted with the intent to assist the government in its investigatory or
> administrative purposes. *Attson*, 900 F.2d at 1433.

*Kerlo*, 311 B.R. at 265.

Just as the trustee's use of the Marshals Service to assist her in carrying out her statutory

---

[16]Although vague, the court wrote that *Barman* set forth "(with improper latitude)", a
threshold standard for a trustee to obtain a bankruptcy court order allowing the inspection of a
debtor's residence for assets belonging to the estate.  300 B.R. at 38.

and fiduciary duties in *Kerlo* was not motivated to assist the government in any investigation or

administrative action, but rather to assist her in carrying out her independent statutory and

fiduciary duties under the Bankruptcy Code to creditors of the estate by maximizing the value of

the estate for distribution to creditors, so in the instant case Brandon as Trustee has "a legitimate,

statutory, independent reason" for following Renn home to secure the assets which he had failed

to disclose in his Schedules. *Kerlo*, 311 B.R. at 265. Brandon was "not acting as an instrument

or agent of the government to carry out or facilitate a government purpose that is subject to the

limitations." *Id.* Brandon's use of the deputy for civil standby did not transform her actions into

a government search or seizure, but rather was for her own safety as in *Kerlo*. 311 B.R. at 265.

Discussing the debtor's legitimate expectation of privacy, the court in *Kerlo* wrote:

> To invoke Fourth Amendment protections, a person must show a legitimate expectation of privacy. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979). A legitimate expectation of privacy requires both (1) a subjective expectation of privacy, and (2) an objectively reasonable expectation of privacy. *Id.* In determining whether someone has a legitimate expectation of privacy for Fourth Amendment purposes, courts consider the following factors: (1) whether the person has a proprietary or possessory interest in the place searched or property to be seized, (2) whether the person has the right to exclude others from the premises, (3) whether the person has taken normal precautions to maintain his or her privacy, and (4) whether the person is legitimately on the premises. *See United States v. Cella*, 568 F.2d 1266, 1280 (9th Cir.1977); *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 544–45 (6th Cir.2003).

> Generally, a person's home is "accorded the full range of Fourth Amendment protections." *Lewis v. United States*, 385 U.S. 206, 211, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). However, the *Barman* court observed:

>> [D]ebtors who have filed for bankruptcy relief must have a significantly reduced expectation of privacy in their "houses, papers, and effects" that society is prepared to recognize as reasonable. The reduced expectation of privacy is a natural consequence of the substantial and detailed disclosures that are inherent in the bankruptcy process.

27

> *Barman*, 252 B.R. at 414. On the other hand, a debtor is not automatically
> stripped of any and all reasonable expectations of privacy with respect to property
> of the estate due to a bankruptcy filing. *Id.* at 415. Rather, whether a debtor has a
> reasonable expectation of privacy with respect to certain property must be
> determined on a case by case basis. *See Rakas v. Illinois*, 439 U.S. 128, 147–48,
> 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).
>
> * * * *
>
> Here, Debtor filed a bankruptcy petition, at which time the Property
> became part of the estate. Trustee determined that there was equity in the Property
> that could be administered for the benefit of creditors.

*Kerlo*, 311 B.R. at 265-66.

Allowing that Renn had a subjective expectation of privacy, and further allowing that

Renn satisfies all four *Cella* factors for expectation of privacy, this Court finds and concludes

that Renn's failure to disclose the gold and silver and other assets in his bankruptcy schedules

significantly reduced his expectation of privacy in his residence even under *Barman.*  252 B.R. at

414; *Kerlo*, 311 B.R. at 266, quoting *Barman*.

Judge Darnell's decision in *Burke* cites *Kerlo* and *Barman* in holding, under the totality

of the circumstances, that even if a defendant could demonstrate a subjective expectation of

privacy in the residence or specific property seized, "this expectation of privacy is not one that

society is prepared to recognize as legitimate" because the defendant should have disclosed the

property in his bankruptcy proceedings.  *United States of America v. Burke*, 2009 WL 173829

*10 (E.D. Cal.).  "It is therefore troubling that defendant seeks to assert a legitimate expectation

of privacy in documents that he was required by law to expose to the public."  *Id.*

As this Court stated above, debtors in bankruptcy have burdens as well as benefits.  Renn

was required to disclose his gold and silver in his sworn Schedules, but failed his burden.

28

Considering the totality of the circumstances in this case, the Court concludes that Renn failed to show that he had an objectively reasonable expectation of privacy when his attorney consented and advised Renn to allow the Trustee to follow him to his residence and search for undisclosed assets, including the told and silver.  *Kerlo*, 311 B.R.  at 265-66; *Smith v. Maryland*, 442 U.S. at 740; *Burke*, 2009 WL 173829 at *10.

Just as in *Kerlo*, the Court concludes that Brandon's search and orderly removal of personal property does not implicate any Fourth Amendment rights.  311 B.R. at 266.  The Court overrules Debtor's objection to the Trustee's sale based on the Fourth Amendment.  Since no other objections to the Trustee's Notice of sale of gold and silver to Hakes exist, the Court overrules Debtor's objection and authorizes the Trustee to sell the estate's gold and silver to Hakes, at prevailing market rates recognizing his testimony that market prices change with time, or to a higher bidder.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this Chapter 7 bankruptcy case under 28 U.S.C. § 1334(a).

2. Approval of the sale of the estate's gold and silver is a core proceeding under 28 U.S.C. § 157(b)(2)(N).

3. The Debtor had a duty to disclose his gold and silver in his Schedules under 11 U.S.C. § 521(a)(1)(B)(I).  The Trustee has a duty to collect and reduce to money the property of the estate under 11 U.S.C. § 704(a)(1).

4. The Trustee's conduct following the Debtor home was intended to further her own ends and not to assist federal law enforcement efforts.  The Trustee had a legitimate independent

29

motivation for engaging in the challenged conduct based on § 704(a)(1), so the Fourth Amendment does not apply.

     5.   Under the totality of the circumstances, the Debtor did not have an objectively reasonable expectation of privacy in his residence when he had failed to disclose his gold and silver that he was required by law to disclose in the bankruptcy process.  Debtor's then-attorney advised the Debtor to permit the Trustee's search of his residence, and the Debtor did not object.

     **IT IS ORDERED** a separate Order shall be entered in conformity with the above, overruling Debtor's objection and approving the Trustee's Notice of Intent to Sell Property at Private Sale (Dkt. 129).

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

30