# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

In re

**WARREN CHARLES BODEKER**,

Debtor.

Case No.  **12-60137-7**

## MEMORANDUM OF DECISION

At Butte in said District this 11th day of June, 2014.

In this Chapter 7 case a hearing was held at Missoula on April 3, 2014, on the following matters:  (1) Debtor's motion for relief and to rescind waiver of discharge and waiver of homestead exemption (Document No. 261) and objections thereto filed by the Trustee Christy L. Brandon ("Trustee") and Office of United States Trustee ("UST"); (2) the Trustee's "Motion for Order Requiring Debtor to Show Cause Why He Should not be Held in Contempt" (Doc. 247); and (3) Debtor's objection (Doc. 237) to the Trustee's employment of real estate professional to market and sell Debtor's residence.  Debtor Warren Charles Bodeker ("Renn" or "Debtor") appeared and testified, represented by attorney Kevin E. Vainio ("Vainio") of Vainio Law Office, Butte, Montana.  Debtor's former attorney Daniel S. Morgan testified, as did Renn's neighbor and friend Roxanne Ryan.  The Trustee appeared and testified, represented by attorney Kyle W. Nelson of Goetz, Baldwin & Geddes, P.C., of Bozeman.  The UST was represented by attorney Daniel P. McKay.  Exhibits ("Ex.") 1, 2, 3,[1] 7, 8, 19, 23, 27, 28, 29, 30, 32, 33, 34, 35, 36, 37, 38,

---

[1]  Two Exhibit "3"s offered by the Trustee were admitted.  The first is the stipulation for waiver which is the subject of Debtor's motion.  The other Ex. 3 is a copy of Document No. 262.

1

A, and E were admitted.[2]  The Court granted the Trustee's request to take judicial notice of Doc. 262 filed on the above-captioned case docket.

At the conclusion of the parties' cases-in-chief the Court heard argument by Debtor's counsel, then took the above-listed matters under advisement.  After review of the pleadings, record, and applicable law, Debtor's motion to rescind his waiver of homestead exemption will be granted based upon the recent United States Supreme Court decision of *Law v. Siegel*, __ U.S. __, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014).  Otherwise, however, for the reasons set forth below Debtor's motion to rescind his waiver of discharge will be denied.  Further, as a result of the restoration of Debtor's homestead exemption, the Trustee's motion to hold Debtor in contempt and to vacate property will be denied and the show cause order vacated, as will the Trustee's application and order to employ real estate professional to sell Debtor's homestead.

This Court has exclusive jurisdiction of this Chapter 7 bankruptcy under 28 U.S.C. § 1334(a).  The pending matters are core proceedings involving waivers of discharge and homestead exemptions, and matters concerning administration of the estate under the U.S. Bankruptcy Code and 28 U.S.C. § 157(b)(2).

## BACKGROUND FACTS & PROCEDURAL HISTORY

Renn Bodeker is 91 years old and lives in a home he built on ten acres at 11 Freedom Lane near Plains in Sanders County, Montana.  He is a World War II military veteran and a man of deep religious conviction.  Renn was married for several years, but his wife Lorna passed away on July 3, 2011, and is buried on his property.  He recorded a declaration of homestead in

---

[2]  The Court reserved ruling on admissibility of Ex. 4, a newspaper article offered by the Trustee in relation to her motion for contempt.  Because of the relief granted by the Court rescinding Debtor's waiver of his homestead exemption, Ex. 4 is refused admission as irrelevant.

Sanders County, and has never recorded an abandonment of the homestead.  In 2003, Ren testified, he finalized an "allodial patent" on his homestead, which he testified gave him "total control" over his property and "nobody could touch it."

Ren filed a voluntary Chapter 7 bankruptcy petition on February 2, 2012, represented by attorney Daniel S. Morgan ("Morgan"), who is an experienced bankruptcy practitioner.  Morgan testified that Renn filed for bankruptcy protection after being sued by a former stepson or son-in-law named Bates, who prevailed against Renn in state court and won a judgment to partition 20 acres of Renn's property.

Renn filed an application to proceed in forma pauperis ("IFP") (Doc. 6)[3] stating under penalty of perjury that he cannot pay the filing fee in full or in installments.  The Court approved Renn's IFP application on February 3, 2012.

Renn listed his home on Schedule A, and listed his claim of homestead exemption on Schedule C.  He signed his Schedules and Statement of Financial Affairs stating under penalty of perjury that they were true and correct.  They were not true and correct.  Renn failed to disclose a substantial collection of gold and silver coins on Schedule B.

The Trustee learned about the gold and silver, which Renn had buried on his property but had not disclosed.  The Trustee asked Renn about the gold and silver at the § 341 meeting, and he admitted that he did not tell her about it.  After the meeting the Trustee followed Renn to his

---

[3]  Under Rule 201, Fed. R. Evid., the Court may take judicial notice of undisputed matters of public record, including documents on file in federal or state courts.  *Harris v. Cnty. of Orange*, 682 F.3d 1126, 1131-32 (9th Cir. 2012); *see Bennett v. Medtronic, Inc.*, 285 F.3d 801, 803 n.2 (9th Cir. 2002) ("[W]e 'may take notice of proceedings in other courts, both within and without the federal judicial systems, if those proceedings have a direct relation to matters at issue.'", quoting *United States ex rel. Robinson Rancheria Citizens Council v. Borneo*, 971 F.2d 244, 248 (9th Cir. 1992)).  The Court takes judicial notice of matters on the docket.

home accompanied by an armed sheriff's deputy present for civil standby. The Trustee testified that she requested a civil standby because she learned that Renn had firearms in his home and she wanted civil standby for her safety.

Renn testified that the Trustee entered his home with an armed deputy and a metal detector on March 5, 2012, without his permission. Renn testified that he told them that they were trespassing and referred to his allodial patent, but that the Trustee told him: "I own everything that you have." He testified that he felt pressured and believed that he would suffer bodily harm if he refused to do what the Trustee demanded. He testified that he developed a pain in his side that lasted until June of 2012.

Renn testified that the metal detector operator walked right over the spot where Renn had buried $1,000 in silver round coins, but did not detect it. The Trustee left Renn's property on March 5, 2012, with cash, firearms, and a dall sheep mount, for which she gave Renn a signed receipt, Ex. E, but without his gold and silver.

Renn testified that he became convinced that the metal detector operator might be dishonest and intended to return later and steal his buried gold and silver. Renn phoned a friend named Richard Kline ("Kline") and his wife, and they helped Renn dig up a pail which contained a thousand silver rounds. Renn testified that Kline took that pail of silver coins home for safekeeping and that Kline advised Renn to tell the Trustee that he sold everything.[4] Kline and Hawley returned Renn's silver rounds to him; he signed a receipt for them dated April 4, 2012.[5]

---

[4] Renn's other gold and silver coins were buried in his greenhouse.

[5] Renn later filled out a complaint against Kline with the sheriff for failure to return all of his silver.

4

Ex. E.

Renn testified that he spoke with his attorney Morgan and a criminal defense attorney about possible criminal charges related to his failure to disclose his gold and silver on his Schedules.  He testified that he was told that things would go easier on him if he signed a waiver of his homestead exemption and discharge, and that if he did not he would be exposed to criminal charges.  Renn agreed that avoiding prosecution was his chief concern.

Renn sent Morgan an email dated March 17, 2012.  Ex. A.  In Ex. A, Renn informed Morgan of an offer he had received to purchase his home for $150,000 cash and giving him time to resettle.  On March 23, 2012, Renn sent Morgan an email complaining that he was "tired of being abused and harassed.  Ex. 19.  He apologized for his omissions of assets and stated that he offered to sell his place and pay some part to his creditors, but he refused to answer any more questions from the Trustee.  Ex. 19.  Renn testified that he agreed to sell his home only if it would be to his benefit, but that he did not understand his creditor situation at the time.

Morgan replied on March 29, 2012, by email, Ex. 23.  Morgan advised Renn that he would not be allowed to sell his home any time soon and that the Trustee and the UST were going to try to surcharge Renn's homestead exemption based upon then-existing 9th Circuit case law, which recently was reversed, in order to make up for Renn's hidden gold and silver assets. Ex. 23.  Morgan testified that the UST raised the possibility of surcharge more than the Trustee.

On April 1, 2012, Renn sent Morgan an email stating that he decided to sell his home and pay his creditors and wanted "to get this over ASAP."  Ex. 27.  At trial Renn testified that his mind was not working right because of the loss of his wife and that Morgan should have told him to wait.

Ex. 27 includes an email from a Norma Jean "Pip" Hawley offering to purchase Renn's home and 10 acres, and some equipment and personal property for $187,000 cash. Renn testified that the offer was from Kline, who Morgan testified is married to Pip Hawley. Morgan sent Hawley to the Trustee.

Ex. 30 is a summary of a phone message from Kline to Morgan prepared by Morgan's staff on April 2, 2012.[6] Morgan testified that Renn was "fed up" with Sanders County and was pleased at the prospect of selling his house to Kline and Hawley, because they would allow him to visit his wife's grave. Morgan explained that Renn wanted to exchange his homestead and discharge to keep his gold and silver and go live with his daughter in Utah.[7] Morgan believed that the sale of Renn's homestead contemplated in the stipulation would result in sufficient proceeds to pay his creditors in full and leave some surplus for Renn to live on,[8] and minimize the chance of any criminal charges, but that if Renn refused to go along with the sale the UST would pursue an equitable surcharge of Renn's homestead. Neal Jensen ("Jensen") of the UST's office drafted the stipulation, Ex. 3.

Ex. 28 is an email exchange dated April 3, 2012, in which Jensen delivered the stipulation and Morgan states that he will advise Renn to sign it. Renn responded to Morgan the

---

[6] The last sentence of the message reads: "He [Kline] said you have to be stern w/ Ren to have him stop bothering you and tell him to Shut up if need to – ." Ex. 30. Morgan testified that the quote was Kline's comment, and did not show friction between his staff and Renn.

[7] Roxanne Ryan testified that the idea that Renn wanted to move to Utah was a "bald faced lie," and that Renn never wanted to sell the property because he did not want to leave his wife. Ex. 23, 27, and A are emails from Renn to Morgan, in each of which Renn plainly states that he wants to sell his property. He wanted to move away from Bates.

[8] Morgan's calculation of the surplus from the proposed sale are on page 2 of Ex. 37.

same day.  In Ex. 29 Renn tells Morgan "I do not want to give up my homestead exemption." Renn testified that he does not remember that he was giving up his homestead by entering into the stipulation, and that he thought that by agreeing to sell his home to pay creditors it would stop all the additional charges.  Ex. 29.  On redirect examination Renn explained that he agreed to sign the stipulation waiving his homestead because he was being threatened with charges.

Morgan testified that he advised Renn to enter into the stipulation to relieve the possibility of criminal charges, but also to avoid the cost of litigation and possible equitable surcharge against Renn's homestead to reimburse the Trustee for the fees and costs caused by Renn's failure to disclose assets.  Later, Morgan clarified that by "charges" he did not mean criminal charges but instead the costs for the Trustee and UST to attend the § 341 meeting and Rule 2004 examination.

Morgan testified that Ninth Circuit case law allowed equitable surcharge at the time and that he went through a cost-benefit analysis with Renn and advised him that Renn's cost to appeal to the Supreme Court would be far more than Renn's equity in his homestead.  In Morgan's opinion, Renn was in no position to appeal; Morgan hoped to avoid the expense and administrative surcharges against Renn's homestead and other assets by selling the homestead, which would allow Renn to move away with some cash.

In addition, Morgan testified that Renn admitted to him that he lied, committed perjury and was ashamed.  Renn testified that Morgan advised him to speak with a criminal attorney. Morgan testified that he told Renn several times to call a criminal attorney and finally Morgan phoned a criminal attorney, Lance Jasper, during a meeting with Renn and had Renn speak with him.  Morgan testified that he advised Renn that a criminal referral would be made to the United

States Attorney because of Renn's undisclosed assets. Later Morgan testified that he believed that Renn's omission of assets from his Schedules violated the Bankruptcy Code and would result in an automatic criminal referral.

Renn testified that the Trustee did not personally threaten him or discuss criminal charges with him and the Trustee also testified that she never threatened Renn with criminal prosecution in conjunction with Ex. 3. Morgan testified that the Trustee and UST never stated that Renn would be criminally prosecuted if he did not sign the Stipulation. No evidence exists in the record that Renn has been charged with any crime. Morgan testified that he did not discuss possible criminal prosecution of Renn with the UST,[9] but that Morgan has seen criminal referrals in his practice and expected it.

Renn reviewed the stipulation waiving his homestead and discharge; he signed the stipulation, which is dated April 3, 2012. Ex. 3. Renn and the Trustee each testified that he signed the stipulation without discussing it with the Trustee. Renn then emailed Morgan on April 3, 2012, asking for an appointment. Ex. 33. Morgan replied giving Renn some times to come to Morgan's office on April 5, 2012.

Renn compiled a numbered list of questions and comments about the upcoming meeting with Morgan, which he signed and dated April 4, 2012. Ex. 35. The numbers correspond to Renn's handwritten notes on an unsigned copy of the proposed stipulation, Ex. 36. Renn testified that he "was under duress during every bit of this."

Renn met with Morgan on April 5, 2012, and Kline was present during at least part of

---

[9] Jensen related to Morgan an analogy about bank robbers surrendering outside the bank after the robbery, to the point that they were still guilty of the crime even though they surrendered, notwithstanding prosecutorial zeal.

that meeting.[10]  Morgan testified that Renn asked his questions on Ex. 35 before signing the Stipulation and that Morgan answered his questions before Renn signed.  On Ex. 35 Renn wrote that the immediate sale of his residence did not sound like it was in his best interest; he felt like the goal in paying creditors in full was to leave him destitute.  Asked about his intent, Renn testified that he was trying to get the matter settled and get his life back.

Ex. 37 is a compilation of Morgan's notes from that meeting.  Ex. 37 does not include anything about waiving Renn's homestead, but Morgan believes that the waiver came up. Morgan testified that Renn had asked Jensen to be excused from appearing at the § 341 meeting and Rule 2004 examination, but Jensen refused to excuse him.  Ex. 34.  Then, Morgan testified, Renn signed the stipulation on April 5, 2012, and authorized Morgan to deliver the signed stipulation to the Trustee and UST.

The stipulation is not notarized, but Morgan testified that Renn signed Ex. 3 in his presence.  The signatures on Ex. 3 are not acknowledged.  Morgan testified that Renn was never given a declaration of abandonment of his homestead; no abandonment of homestead was recorded in Sanders County.

At the time of the meeting on April 5, 2012, Renn had not turned over the gold and silver to the Trustee, but eventually he turned it over and the Trustee sold it.[11]  Asked why, Renn testified that he assumed he would be in trouble if he did not give the Trustee his gold and silver.

Renn testified that he did not fully understand the ramification of waiving his homestead

---

[10]  Apparently Kline drove Renn from his home in Sanders County to Missoula for the meeting with Morgan on April 5, 2012, and back.

[11]  Morgan estimated the amount the gold and silver was sold for at approximately $80,000.

and discharge and that he would not have signed it if he'd understood what such waivers meant. Under recross examination, however, Renn admitted that he understood that he was waiving his homestead.  Morgan testified that Renn agreed to the stipulation, but later changed his mind.

Morgan replied to Jensen by email on April 6, 2012, informing him that Renn authorized him to deliver the original, signed stipulation at the § 341 meeting.  The stipulation was filed on April 6, 2012, and was approved by the Court without notice or a hearing on April 9, 2012, given the agreement by the parties.  The Trustee did not record Ex. 3 at the Sanders County Clerk and Recorder.

Ren testified that if, he had been able to testify at a hearing on approval of the stipulation, he would have told the Court that he was under pressure and duress or he would never have signed it.  On the other hand, asked on direct examination if he believed the stipulation waiving his homestead was valid Ren answered:  "Absolutely."  Asked again, Renn admitted that he released his homestead, but he testified that he didn't understand any part of what he was doing. Renn and Morgan both testified that after thinking about it, Renn changed his mind.  Ryan testified that Renn was confused and missing his wife and was in no condition to make the decisions he made.

On April 15, 2014, Renn sent Morgan another list of questions and concerns regarding the stipulation.[12]  Ex. 38.  A Rule 2004 examination of Renn took place on April 16, 2012.  Renn testified that the examination lasted eight hours and that he was harassed, abused and backed into a corner by the Trustee and UST.  The transcript, Ex. 7, includes discussions about documents

---

[12]  The Court admitted Ex. 38 only to the extent of the typed text, and not the handwritten comments thereon.

10

Renn recorded on the title to his home and ten acres and his recommendation that his property be sold "as is."   Because Renn was experiencing pain, after the examination Morgan sent Renn to the VA hospital, where he said he was diagnosed with cancer.

The Trustee testified that some, but not all, of Renn's gold and silver was turned over to her at the Rule 2004 examination.  She testified that she had no idea that more existed, but that she was informed later about additional gold and silver in Kline's possession.  She called Vainio and arranged for turnover; she took possession of Renn's remaining gold and silver in August of 2012, worth an estimated $20,000.

The Trustee arranged a buy-sell agreement concerning the homestead with Hawley and sent a copy to Renn and Morgan by email.  On May 3, 2012, the Trustee filed a motion to sell the homestead and filed a motion for an order requiring Renn to vacate his home on May 10, 2012.

Morgan withdrew as Renn's attorney shortly thereafter on May 11, 2012, with Renn's consent.  Morgan testified that he withdrew because Renn filed a pleading pro se and wanted to pursue "freemen" legal theories, so Morgan withdrew.  For a brief period before retaining Vainio Renn was not represented by an attorney.

Renn testified that after waiving his homestead, and while not represented by counsel, he returned to the Sanders County Courthouse and recorded a new declaration of homestead in order to protect his property.  He testified that after he thought about it he did not want to waive his homestead.  He has not waived or abandoned his second homestead, and he testified that he continues to live in his home based on his allodial patent and the Supremacy Clause.

On May 12, 2012, the Trustee filed a motion to expunge Renn's real property filings, including his second declaration of homestead.  A hearing on those matters was held on June 12,

11

2012.  Renn did not file objections or appear.  He testified that on June 12, 2012, he was in the VA hospital with cancer, and that Ryan informed the Court that Renn could not attend the hearing.  Renn filed a notice of hospitalization at the VA on June 11, 2012, Doc. 79.  The Court denied his motion to continue the hearing.

Ryan appeared at the June 12, 2012, hearing and testified on Renn's behalf under a power of attorney.  After the hearing the Court granted the Trustee's motions to sell the property by Order entered June 12, 2012, which ordered the Debtor to vacate 11 Freedom Lane within 5 days.  Trustee's Ex. 1.  At the hearing on April 3, 2014, Renn was defiant about Ex. 1, calling it a "batch of bullpucky" and stated that he never intends to waive his homestead no matter what because it is protected by patent and homestead.  Later, however, Renn testified that he complied with the Order, Ex. 1, and vacated his homestead against his will.  He also testified that he has no problem obeying lawful orders.  On June 22, 2012, Renn filed a notice that his temporary address would be 141 Clark Cr. Loop in Plaints.  Ex. 2.  He testified that he moved temporarily because he was so weak from cancer treatment.

Notwithstanding his move, the Trustee testified that her sale of the property was disrupted by Renn in June of 2012, and the sale was withdrawn.  The Trustee moved to vacate the Order granting her motion to sell the homestead free and clear of liens and withdrawing her motion and on July 9, 2012, the Court granted the motion and vacated the Order granting the Trustee's motion to sell the homestead.  The Trustee testified that the situation had become too dangerous for her to administer the house, so she concentrated on selling the gold and silver.  Renn objected

12

to the Trustee's motion to sell the gold and silver, but that sale concluded in June of 2013.[13]

Renn retained Kevin Vainio as his attorney, and Vainio filed his notice of appearance on June 29, 2012. The Trustee moved to compel the Debtor to amend his Schedules. That matter was resolved and the Debtor filed his amended Schedules on August 28, 2013.

Asked by Debtor's counsel to admit that Renn now has turned over everything that he should have turned over, the Trustee disagreed. She testified that he did not turn over all of his gold and silver when required, that Renn still has not turned over firearms which he disclosed in the Rule 2004 examination, and that he has not turned over tractor attachments worth between $10,000 and $12,000.

Vainio attempted to impeach the Trustee with the Debtor's amended Schedule B (Doc. 227). Renn's amended Schedule B lists at item 33 ("Farming equipment and implements") a 1994 Rhino 50HP Tractor valued at $1,500.00. The Trustee disagreed with Vainio's suggestion that the tractor listing included the attachments, which she testified could be sold separately and were worth up to $12,000.

Item 22 of amended Schedule B ("Patents, copyrights, and other intellectual property. Give particulars.") includes a single item – Renn's name followed by a copyright symbol, listed at an unknown value. The Trustee testified that Renn failed to disclose on his schedules an agricultural patent he owns which involves a type of farm tool. She testified that Renn admitted in his deposition that he failed to disclose a 7 mm handgun in his schedules and that handgun still is not listed. Lastly, the Trustee testified that Renn failed to disclose greenhouses which are

---

[13]  During the time the Trustee's motion to sell the gold and silver was pending the value decreased from the original $96,000 offered to approximately $59,543.00 at the time of sale. Doc. 211.

13

personal property located on his homestead.

On August 29, 2013, the Trustee filed her application to employ Steve Stelling, Jr. as real estate agent to market and sell the property at 11 Freedom Lane. The Court approved the application on August 30, 2013. Debtor filed his objection to employment of real estate agent on September 13, 2013, on the grounds he intended to filed a motion to rescind his waiver and keep his homestead. The Trustee filed a reply arguing that the stipulation waiving Renn's homestead exemption was valid and entered into on advice of counsel and that Renn's right to appeal approval of the stipulation and request to rescind his waiver are time-barred.

On September 27, 2013, the Trustee filed her motion for order to show cause why the Debtor should not be held in contempt and subject to sanctions for moving back into 11 Freedom Lane in violation of the Court's Order to vacate the property, for locking a gate and installing a warning sign and otherwise preventing the Trustee from accessing the property in order to inspect, clean, and sell it. Debtor asked for and was granted an extension of time to respond to the Trustee's motion for contempt, but did not file a response. On October 23, 2014, the Court entered an Order (Doc. 254) granting the Trustee's motion and setting a civil contempt hearing, which was continued until finally held on April 3, 2014. At the hearing the Trustee requested sanctions in the amount of $350 per month against Renn for his contempt, which he may recover if he moves out.

On October 31, 2013, the Debtor filed his motion for relief and to rescind his waivers of homestead exemption and discharge and order approving the waiver. The motion is based upon Rule 60(b), applicable under F.R.B.P. 9024, and the grounds that the judgment is void because Debtor was not given due process rights to a hearing on approval of the stipulation. Debtor

14

argues that he has delivered and accounted for all property and that he should have been given notice and a hearing before the stipulation was approved as fair and equitable as required under F.R.B.P. 9019(a).  Further, Debtor argues that he should be allowed to rescind the stipulation because he entered into the stipulation under coercion and menace consisting of express or implied threat of criminal prosecution and without understanding the meaning and consequences of his waivers because of his age, hearing impairment and grief.  Finally, Debtor argues that relief from his waiver of homestead should be granted because he recorded a subsequent homestead declaration of homestead after the waiver as allowed in *In re Michael*, 163 F.3d 526 (9th Cir. 1998), and because the requirements of Montana law for abandonment of a homestead were not satisfied.  Because his waiver should be rescinded, Debtor argues, he cannot be guilty of contempt for failing to vacate his homestead.

Also, on October 31, 2013, Debtor filed a notice of change of address from 141 Clark Creek Loop in Plains, Montana, back to 11 Freedom Lane.  Trustee's Ex. 3.  Renn testified that he moved to 141 Clark Creek Loop when he was sick and weak, but he returned to his homestead shortly before October 2013.  Renn testified that the house was left open, so he decided to move back into his home.  He denied that the notice of temporary change of address was equivalent to an abandonment and testified that he had left his stove, refrigerator and bed in his homestead.

Renn testified that the padlock in a gate placed on his driveway was probably his, and that he posted a sign on a tree to the side of a gate.  The sign refers to MCA 49-1-103 ("Right to use force") and states that "any necessary force may or will be used" in order to prevent trespass.[14]

---

[14] Ex. 4 is photographs of the locked gate and warning notice.  The Court reserved ruling on the admission of Ex. 4; the objection is sustained and it is refused.

Renn testified that he placed the sign in order to affirm his right to privacy. Asked about a newspaper article printed in the Clark Fork Valley Press and Daily Inter Lake, Renn testified that "I guess I did" tell the reporter "The only way I'll leave here is feet first."[15]

The Trustee and UST both filed objections to Debtor's motion to rescind waivers. The UST objected that the order approving stipulation is not void and was entered into by the Debtor on advice of counsel, and that Debtor's motion to rescind was not timely filed because it was not filed for 19 months after the Court approved the stipulation. The Trustee and UST deny threatening Renn with prosecution if he did not sign the stipulation.

The Trustee argues that notice and a hearing were not required under 11 U.S.C. § 102(1)(B) because the parties jointly sought approval of the stipulation and a hearing would have been superfluous. The Trustee argues that no evidence exists in the record of fraud or duress by the Trustee and UST and that the approved stipulation controls over Renn's second recorded declaration of homestead under bankruptcy law.

Debtor filed a reply to the Trustee's and UST's objections on February 28, 2014, repeating his contentions that the stipulation is void for lack of notice and due process, that he never abandoned his homestead and that Debtor's subsequent homestead declaration was proper and controls.

On March 4, 2014, the Trustee filed a notice of supplemental authority advising the Court of the Supreme Court's decision in *Law v. Siegel,* but contending that it is not applicable with

---

[15] Ex. 5 is a copy of the articles, found at Doc. 301. The Court reserved ruling on Debtor's objection at the hearing. Ex. 5 was not offered and was not admitted. The Debtor's testimony about what he told the reporter is not hearsay under Fed. R. Evid. 801(d)(2) ("Opposing Party's Statement").

respect to the pending matters because the Trustee's reference to the right to surcharge the homestead was justified under Ninth Circuit law at the time, *Latman v. Burdette*, 366 F.3d 774 (2004).  The Debtor filed a response arguing that *Law v. Siegel* held that *Latman* never was "good law" because it contravened 11 U.S.C. § 522's protections of a debtor's claims of exemptions and the Court should grant his motion to rescind waiver of homestead exemption because the threat to surcharge of his homestead was not permitted.

In oral argument Vainio argued that Renn rescinded the stipulation by recording another homestead declaration, and that the Supreme Court's decision in *Law v. Siegel* held that a court cannot surcharge a debtor's exempt property to satisfy administrative expenses except under the limited instances specified in § 522.  Vainio argued that Renn entered into the stipulation waiving his homestead on the advice of counsel in order to avoid the equitable surcharge against his homestead, which was authorized under Ninth Circuit precedent but since prohibited by *Law v. Siegel* and he urges this Court to change the "bad result" of Renn's waiver of homestead based upon the new rule from *Law v. Siegel.*

## DISCUSSION

The Court begins with the Debtor's contentions that his waivers of his homestead exemption and discharge should be rescinded because he was under duress and threat of criminal prosecution, and was not thinking clearly because of his grief from the loss of his wife.  The Court sympathizes with Renn for the loss of his spouse.  However, the evidence does not support Renn's contentions that he did not understand that he was waiving his homestead exemption.

The stipulation is clear:  "Bodeker affirmatively agrees to the waiver of his homestead exemption, and to the immediate sale of his residence by the trustee, . . . ."  Ex. 3.  The exhibits

17

discussed above of email exchanges between Renn and Morgan make clear that Renn understood that the stipulation provided for waiver and sale of his homestead. He had reservations, but ultimately he signed the stipulation on the advice of counsel.

Renn testified that he did not understand and never would have agreed to waive his homestead exemption if he was thinking clearly. However, later he and Morgan each testified that Renn simply changed his mind after thinking about it. At this point it is appropriate to comment on Renn's credibility.

Evaluating the weight to be assigned to such evidence is the province of the bankruptcy court. See *Groves v. Pickett*, 420 F.2d 1119, 1126 (9th Cir. 1970). Having observed Renn's demeanor while testifying under oath, his changes in his testimony, and noting Renn's failure to disclose his buried gold and silver on his original Schedules and IFP application, which he signed under penalty of perjury, the Court finds that Renn is not credible. *Allen v. Iranon*, 283 F.3d 1070, 1078 n.8 (9th Cir. 2002); *In re Taylor*, 514 F.2d 1370, 1373-74 (9th Cir. 1975); *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). Neither respect for Renn's military service and sincere religious beliefs, nor sympathy for his grief at the loss of his wife, can excuse Renn's false statements and omissions made under penalty of perjury. As a result, the Court assigns little probative weight to Renn's testimony unless corroborated by credible evidence.

With respect to Renn's reliance on his "allodial patent," the court in *Hamilton v. Noble Energy, Inc.*, 220 P.3d 1010, 1014 (Colo. App. 2009) surveyed cases rejecting claims of self-proclaimed land patents as "meritless" and "frivolous." (Citing cases). This Court agrees.

Renn argues that he signed the stipulation under duress and threat of criminal

18

prosecution. However, not one scintilla of evidence exists in the record that the Trustee or UST threatened Renn with criminal prosecution. Renn, Morgan and the Trustee each testified that he did not discuss the stipulation with the Trustee.

The only evidence in the record is that Renn's attorney Morgan advised him of the possibility of "charges," which Morgan explained meant an equitable surcharge against his homestead to pay for the Trustee's expenses and that Morgan explained to Renn the possibility of criminal charges and had Renn talk to a criminal attorney, who confirmed to Renn the possibility of criminal charges. No threat of criminal charges were shown to come from the Trustee or UST to Renn by any evidence. Morgan and the criminal attorney were the sole source.

The Debtor voluntarily selected Morgan as his attorney of record, and he cannot avoid the consequences of the acts or omissions of his freely-selected attorney. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 396-97, 113 S.Ct. 1489, 1499, 123 L.Ed.2d 74 (1993); *Link v. Wabash Co.*, 370 U.S. 626, 633-34 (1962); *In re Casey*, 193 B.R. 942, 949 (Bankr. S.D. Cal. 1996). Morgan is an experienced bankruptcy attorney. He testified that he has seen criminal referrals in his practice and that a criminal referral was a possibility in Renn's case because of his failure to disclose his gold and silver.

In this Court's view Morgan's advice was informed, legitimate and valid and consistent with Morgan's responsibility to his client under Montana Rules of Professional Conduct 1.4(b) ("A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."). Initially Renn followed Morgan's advice and signed the stipulation waiving his homestead and discharge and consenting to the sale of his home. Morgan believed that plan would allow Renn to move on with his life after paying his

19

creditors in full (making his waiver of discharge superfluous), with some cash left over.  Renn changed his mind and Morgan withdrew.  Renn was free to change his mind about the merits of the stipulation, but he was not free to withdraw from the approved stipulation.

Renn argues that Montana law controls, that he did not record a notice of abandonment of his homestead and his recording of a subsequent homestead declaration gave rise to a new homestead exemption.  District courts have jurisdiction to enforce complete settlement agreements.  *Doi v. Halekulani Corp.*, 276 F.3d 1131, 1138 (9th Cir. 2002); *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987).  This Court has the inherent power to enforce the terms of a settlement agreement in litigation before it.  *In re Brandt*, 19 Mont. B.R. 162, 168 (Bankr. D. Mont. 2001); *TNT Mktg., Inc. v. Agresti*, 796 F.2d 276, 278 (9th Cir.1986) (per curiam) (district courts retain inherent power to enforce settlement agreements).

The stipulation at Ex. 3 is a complete settlement agreement wherein Renn waived his homestead exemption and discharge.  The evidence discussed above describes the negotiation process undertaken by Renn, Morgan, Trustee and UST.  All the parties signed the stipulation; it was approved by the Court.  Renn did not file an appeal and did not request relief from the stipulation until more than a year later.

This Court has the inherent power to enforce the stipulation.  Renn argues that Montana law governing abandonment was not satisfied, and that he recorded a subsequent declaration of homestead which reinstated his homestead exemption.  Those two arguments are somewhat in conflict, since if abandonment was required and not satisfied then no subsequent recording of another declaration of homestead would be necessary.

Renn's contentions fail because Renn did not simply waive his first declaration of

20

homestead in Ex. 3.  He "agrees to the waiver of his homestead exemption, and to the immediate

sale of his residence . . . ."  Ex. 3.  That provision would be meaningless if Renn was free to

reinstate his homestead exemption and prevent the sale by recording another declaration of

homestead.  This Court approved the stipulation, and the Court has the inherent authority to

enforce its terms.  *Brandt*, 19 Mont. B.R. at 168; *Callie v. Near*, 829 F.2d at 890.  Renn waived

his homestead exemption, not just his first declaration of homestead, in Ex. 3.  This Court

approved the stipulation and has the inherent authority to enforce Renn's waiver of homestead

exemption, no matter how many times he asserts it.  *Id.*  The homestead exemption having been

waived, the Trustee is responsible for managing liquidation of the property along with other

estate assets and distribution of the proceeds.  *Law v. Siegel*, 134 S.Ct. at 1192; 11 U.S.C. §

741(a)(1).

Next, Renn argues that he was deprived due process because no hearing was scheduled

and held on approval of the stipulation after notice.  The Court approved the stipulation by order

entered on April 9, 2012, three days after the UST filed the fully executed stipulation, without

holding a hearing.  Rule 9019(a), F.R.B.P., provides that the court may approve a compromise or

settlement "[o]n motion by the trustee and after notice and a hearing . . . ."

The phrase "after notice and a hearing" is defined at 11 U.S.C. § 102(1).    Section 102(1)

provides:

In this title–

  (1) "after notice and a hearing", or a similar phrase—

    (A) means after such notice as is appropriate in the
    particular circumstances, and such opportunity for a
    hearing as is appropriate in the particular circumstances;

21

but

     (B) authorizes an act without an actual hearing if such
notice is given properly and if —
          (I) such a hearing is not requested timely by a
          party in interest; or
          (ii) there is insufficient time for a hearing to be
          commenced before such act must be done, and
          the court authorizes such act"

A leading commentator explains the rule of construction of the phrase "after notice and a hearing" from § 102(1):

"After notice and a hearing" means after such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in the particular circumstances.  However, the phrase is construed to authorize an act without an actual hearing if notice is given properly and if a hearing is not timely requested by a party in interest . . . .

    *It is thus clear from the express language of the statute that an actual hearing is not necessary in all circumstances.*"

8 COLLIER ON BANKRUPTCY ¶ 1300.06[1][a] (16th ed. 2010) (emphasis added).  The Ninth Circuit recognized the effect of § 102(1) in *In re Lowenschuss*, 171 F.3d 673, 685-86 (9th Cir. 1999), *cert. denied* 528 U.S. 877, 120 S.Ct. 185, 145 L.Ed.2d 156 (1999):  "Under the Bankruptcy Code, the bankruptcy court may take actions without an actual hearing if (1) a party receives notice of the proposed action, and (2) a hearing 'is not timely requested by a party in interest.'  11 U.S.C. § 102(1)(B)."  *See also Boone v. Burk (In re Eliapo)*, 468 F.3d 592, 602 (9th Cir. 2006).

As a practical matter, holding a hearing on every stipulation filed in every bankruptcy case would drain scarce judicial resources.  While in hindsight scheduling a hearing on important matters such as waiver of a discharge or homestead exemption might be appropriate, in this Court's view, the lack of a hearing did not deprive Renn of due process.  Renn was a party to the

22

stipulation and had notice of its terms throughout extended negotiations in which he was represented by counsel.  He agreed to the stipulation and signed it.  After the stipulation was approved he did not timely request a hearing on the stipulation and neither did anyone else.

Accordingly, the Court finds and concludes that Renn was not deprived of due process when the Court approved the stipulation without a hearing.  *Lowenschuss*, 171 F.3d at 685-86; § 102(1)(B).  Therefore, the Court finds that Renn is not entitled to rescission of his waiver of homestead exemption and discharge under Rule 60(b)(4) on the ground that the judgment is void.

Because of the Supreme Court's recent decision in *Law v. Siegel*, however, the Court will construe Renn's motion for relief as a motion to consider the continuing viability of applying the law of the case doctrine.

The law of the case doctrine states that "when a court decides upon a rule of law, that decision should govern the same issues in subsequent stages in the same case."  *Caldwell v. Unified Capital Corp. ( In re Rainbow Magazine, Inc.)*, 77 F.3d 278, 281 (9th Cir.1996) (quoting *Herrington v. Cnty. of Sonoma*, 12 F.3d 901, 904 (9th Cir.1993)).  Law of the case doctrine is discretionary, not mandatory.  *Merritt v. Mackey*, 932 F.2d 1317, 1320 (9th Cir.1991).  Nevertheless, that discretion is limited.  *Thomas v. Bible*, 983 F.2d 152, 155 (9th Cir.1993).  A court's prior decision should be followed unless:  "[T]he decision is clearly erroneous and its enforcement would work a manifest injustice, [] intervening controlling authority makes reconsideration appropriate, or [] substantially different evidence was adduced at a subsequent trial."  *In re Rainbow Magazine, Inc.*, 77 F.3d at 281.

Debtor's motion to rescind waivers does not present newly discovered evidence which was not available to the Debtor earlier in the litigation.  It appears, however, that the Supreme

23

Court's decision in *Law v. Siegel* is an intervening change in the law governing the availability of an equitable surcharge against a debtor's exempt property, which could justify the Court's exercise of discretion in favor of reconsidering Debtor's waivers.

*Law v. Siegel* was decided on March 4, 2014, before the hearing on the pending matters but long after the negotiations which resulted in the stipulation and court approval. The Court will address Debtor's waiver of the homestead exemption separately from his waiver of his discharge.

### A. Waiver of Homestead Exemption.

Morgan advised Renn that Ninth Circuit case law enabled a trustee to equitably surcharge a debtor's exemptions. In *Latman* the Ninth Circuit held that a bankruptcy court may equitably surcharge a debtor's exemptions "when reasonably necessary both to protect the integrity of the bankruptcy process and to ensure that a debtor exempts an amount no greater than what is permitted by the exemption of the Bankruptcy Code." 366 F.3d at 786. The debtor had included nonexempt property in auction proceeds claimed as exempt. *Latman*, 366 F.3d at 786.

In *Law v. Siegel* the bankruptcy court granted a trustee's motion to equitably surcharge the entirety of Law's homestead exemption to defray the trustee's attorney's fees incurred overcoming Law's fraudulent misrepresentations. 134 S.Ct. at 1193. The Ninth Circuit BAP affirmed based upon *Latman*'s recognition of the bankruptcy court's power to equitably surcharge a debtor's exemptions in exceptional circumstances, such as when a debtor engages in inequitable or fraudulent conduct. 134 S.Ct. at 1193-94. The Ninth Circuit affirmed the BAP. *Id.* at 1194.

The Supreme Court reversed. *Id.* at 1198. The Court concluded that the bankruptcy

24

court's equitable surcharge under 11 U.S.C. § 105(a) was unauthorized because it contravened a specific provision of the Code, i.e., 11 U.S.C. § 522. *Id.* at 1195. The Court noted that § 522 entitled Law to a homestead exemption under state law, and § 522(k) made the homestead exemption "not liable for payment of any administrative expense." *Id.*

The Court continued: "§ 522 does not give courts discretion to grant or withhold exemptions based on whatever considerations they deem appropriate. Rather, the statute exhaustively specifies the criteria that will property exempt." *Id.* at 1196. Because of the "carefully calibrated exceptions and limitations" to exempt property set forth in § 522, the Court stated that "courts are not authorized to create additional exceptions." *Id.*

In the instant case the evidence shows that Morgan advised Renn of the possibility of criminal prosecution when recommending that he enter into the stipulation waiving his homestead exemption and discharge. That was not, however, the main reason for Morgan's recommendation. Morgan testified that he was mainly concerned about "charges," by which he explained he meant the Trustee's ability under *Latman* to equitably surcharge Renn's homestead exemption to recover the Trustee's and UST's professional fees and costs.

The bankruptcy court in *Law v. Siegel* granted the trustee's motion to equitably surcharge Law's homestead exemption, and the Ninth Circuit affirmed. 134 S.Ct. at 1193-94. Morgan's advice to waive the homestead exemption was based on controlling authority at the time. The Supreme Court's decision in *Law v. Siegel* is an intervening change in the controlling law. The same equitable surcharge imposed by the bankruptcy court in *Law* is not available to this Court after *Law v. Siegel*, and no suggestion exists that Renn's homestead exemption is subject to limitation or disallowance under the enumerated exceptions and limitations of § 522. Renn's

25

homestead is not liable for payment of any administrative expenses under § 522(k).  *Id.* at 1195.

The threat of an equitable surcharge against Renn's homestead exemption disappears after *Law v. Siegel*.  As to whether to apply *Law v. Siegel* retroactively to Renn's waiver of his homestead exemption the Supreme Court's decision is silent.  Its reasoning, however, based on the express controlling provisions of § 522 precluding the court's exercise of inherent powers under 11 U.S.C. § 105(a), suggests that the trustee's and UST's arguments to Renn that they would pursue an equitable surcharge based on Latman against Renn's homestead exemption were without merit.  Morgan's advice to his client that an equitable surcharge threatened his homestead exemption was consistent at the time with controlling authority which has been reversed, and is no longer good law.

This Court has discretion to consider Renn's motion for relief as a motion to consider the continuing viability of applying the law of the case doctrine.  The Trustee and UST are correct that a substantial amount of time elapsed before Renn moved to rescind his waiver of homestead exemption.

Based on *Law v. Siegel* and the unavailability of the application of an equitable surcharge, which the evidence shows was the main reason Renn agreed to waive his homestead exemption, this Court concludes that this case warrants considering the continuing viability of applying the law of the case doctrine with respect to Renn's waiver of his homestead exemption.  This decision is a close call, and should not be construed as approval of or to excuse the Debtor's conduct.  Rather, the Court grants Renn relief from his waiver of homestead exemption because if he appealed, *Law v. Siegel* not *Latman* would be controlling authority.

Rather than requiring Renn to comply with the order to vacate and appeal, this Court may

in some circumstances "be authorized to dispense with procedural niceties in order to reach more expeditiously an end result required by the Code." *Law v. Siegel*, 134 S.Ct. at 1197 (construing dictum in *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 375-76, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007)).  Reconsideration of Debtor's waiver of his homestead exemption warrants also reconsidering and vacating the Court's Order for Renn to vacate his homestead, the Court's show cause Order to sanction him for contempt, and the Order approving employment of the realtor to market and sell the homestead.  Since the Court grants Debtor's motion to rescind waiver of his homestead exemption, the Trustee may not sell it and the Debtor does not need to vacate his homestead, and thus the Debtor should not be held in contempt for failure to vacate his homestead.

The Court's decision based on *Law v. Siegel* will result in a hardship to the Trustee, the Trustee's attorneys and the real estate professional, whose services for the estate may go uncompensated.  This Court believes it has no choice.  As the Supreme Court noted:

> We acknowledge that our ruling forces Siegel to shoulder a heavy financial burden resulting from Law's egregious misconduct, and that it may produce inequitable results for trustees and creditors in other cases. We have recognized, however, that in crafting the provisions of § 522, "Congress balanced the difficult choices that exemption limits impose on debtors with the economic harm that exemptions visit on creditors." *Schwab v. Reilly*, 560 U.S. 770, 791, 130 S.Ct. 2652, 177 L.Ed.2d 234 (2010). The same can be said of the limits imposed on recovery of administrative expenses by trustees. For the reasons we have explained, it is not for courts to alter the balance struck by the statute. Cf. *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 376–377, 110 S.Ct. 680, 107 L.Ed.2d 782 (1990).

134 S.Ct. at 1197-98.

## B.  Waiver of Discharge.

Turning to the portion of Debtor's motion which requests that the Court rescind his

27

waiver of discharge in the stipulation, *Law v. Siegel* offers the Debtor no support.  On the contrary the Court wrote:

> Our decision today does not denude bankruptcy courts of the essential "authority to respond to debtor misconduct with meaningful sanctions." Brief for United States as Amicus Curiae 17. There is ample authority to deny the dishonest debtor a discharge. See § 727(a)(2)-(6). (That sanction lacks bite here, since by reason of a postpetition settlement between Siegel and Law's major creditor, Law has no debts left to discharge; but that will not often be the case.) In addition, Federal Rule of Bankruptcy Procedure 9011—bankruptcy's analogue to Civil Rule 11—authorizes the court to impose sanctions for bad-faith litigation conduct, which may include "an order directing payment ... of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." Fed. Rule Bkrtcy. Proc. 9011(c)(2). The court may also possess further sanctioning authority under either § 105(a) or its inherent powers. Cf. [*Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-49, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)]. And because it arises postpetition, a bankruptcy court's monetary sanction survives the bankruptcy case and is thereafter enforceable through the normal procedures for collecting money judgments. See § 727(b). Fraudulent conduct in a bankruptcy case may also subject a debtor to criminal prosecution under 18 U.S.C. § 152, which carries a maximum penalty of five years' imprisonment.
>
> But whatever other sanctions a bankruptcy court may impose on a dishonest debtor, it may not contravene express provisions of the Bankruptcy Code by ordering that the debtor's exempt property be used to pay debts and expenses for which that property is not liable under the Code.

*Law v. Siegel*, 134 S.Ct. at 1198.

The Debtor's primary focus in his motion to rescind waivers and supporting briefs is his homestead exemption.  His arguments in support of rescinding waiver of his homestead exemption are subject to the same reasoning discussed above, with the exception that *Law v. Siegel*'s concluding passage quoted above states that there "is ample authority to deny the dishonest debtor a discharge."  *Id.*  Since *Law v. Siegel* is the main reason this Court grants reconsideration of Renn's waiver of his homestead exemption but provides no support to reconsider waiver of his discharge, the Court finds no intervening controlling authority or other

28

reason sufficient to exercise its discretion in favor of reconsidering Debtor's waiver of his discharge.

The principal purpose of the Bankruptcy Code is to grant a "fresh start" to the "honest but unfortunate debtor". *Marrama v. Citizens Bank of Mass.*,549 U.S. at 367. The corollary to this policy is that only the "honest but unfortunate" debtor is entitled to an entirely unencumbered fresh start. *Grogan v. Garner*, 498 U.S. 279, 286-87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *In re Albarran*, 347 B.R. 369, 379 (9th Cir. BAP 2006).

The evidence admitted at the hearing on April 3, 2014, along with the Debtor's statements and omissions in his Schedules, IFP application, and his attorney's testimony show that Renn has not been honest. He failed to disclose buried gold and silver valued at tens of thousands of dollars in his sworn Schedules and IFP application, in which he represented he lacked the assets even to pay his filing fee. His age, grief, military service and paeans to his philosophy of self reliance and religious faith do not excuse his dishonesty.

The homestead exemption is an important right enshrined in Montana's Constitution which must be liberally construed in favor of debtors. Constitution of the State of Montana, Article XIII, section 5; *MacDonald v. Mercill*, 220 Mont. 146, 714 P.2d 132, 135 (1986). By contrast a discharge in bankruptcy is a privilege, not a right, and only inures to the benefit of the honest debtor. *Partners for Health and Home, L.P. v. Seung Wee Yang*, 488 B.R. 109, 119 (C.D. Cal. 2012), quoting *Matter of Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996).

Renn agreed to waive his discharge on the advice of counsel and signed the stipulation. He waited more than a year before filing a motion to rescind his waiver of discharge. Debtor offered no new evidence and offered no intervening controlling law akin to *Law v. Siegel* that

29

would justify the Court's exercise of discretion in favor of granting Debtor relief from his waiver of his discharge.

Renn's dishonesty in his Schedules and IFP application support his waiver of discharge, and demonstrate the futility of granting reconsideration of his waiver of discharge. Debtor's Schedules and IFP application are on the case docket, evidencing his omissions of assets, false oaths and failure to explain loss of assets. If the Court were to grant the Debtor reconsideration of his waiver of discharge the Trustee and UST would have no choice but to initiate an adversary proceeding seeking denial or revocation of Debtor's discharge under several subsections of 11 U.S.C. § 727(a). Debtor's testimony in numerous hearings and transcripts, and his attorney's testimony establish that Renn lied on his Schedules.

Even after he amended his Schedules, the evidence shows they are not complete. The Trustee testified that Renn's amended Schedules still do not include a 7 mm handgun, a patent for a farm tool, and tractor implements worth up to $12,000. Her testimony is uncontroverted, and all of this evidence cannot be ignored, explained or disproven in a future proceeding to determine Renn's entitlement to a discharge, in part because Renn destroyed his own credibility. He stipulated to waiver of his discharge on the advice of counsel after extensive consultation. His attorney's advice was sound, and this Court concludes that the Debtor has failed to satisfy his burden to show that the Court should exercise its discretion in favor of reconsidering his waiver of discharge.

**IT IS ORDERED** a separate Order shall be entered in conformity with the above granting Debtor's motion to rescind waiver of his homestead exemption (Doc. 261), but denying Debtor's motion to rescind waiver of his discharge. The Court's Order directing the Debtor to

vacate his homestead property (Doc. 86) will be vacated, and the Trustee's motion for order

directing Debtor to vacate the homestead (Doc. 49) will be denied.  The Debtor's objection to

Trustee's employment of real estate professional to market and sell Debtor's residence will be

sustained, the Order appointing Steve Stelling Jr. and Stelling & Associates as real estate agent

for the estate (Doc. 232) will be vacated and the Trustee's application to employ real estate

agent (Doc. 231) will be denied.  The Trustee's "Motion for Order Requiring Debtor to Show

Cause Why He Should not be Held in Contempt" (Doc. 247) will be denied without prejudice,

and this Court's Order to Show Cause (Doc. 254) will be vacated.


                              BY THE COURT

                              _Ralph B. Kirscher_____
                              HON. RALPH B. KIRSCHER
                              U.S. Bankruptcy Judge
                              United States Bankruptcy Court
                              District of Montana